IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

THOMAS FERGUSON,

                              Plaintiff,

                                              Civ. Action No.
                                              3:06-CV-0328 (DEP)

          vs.

LANDER CO., INC.,

                              Defendant.

_____

APPEARANCES:                           OF COUNSEL:

FOR PLAINTIFF:

COUGHLIN, GERHART LAW FIRM      JEFFREY HUSISIAN, ESQ.
19 Chenango Street               OLIVER N. BLAISE, III., ESQ.
P.O. Box 2039
Binghamton, NY 13902-2039

FOR DEFENDANT:

TAYLOR, COLICCHIO LAW FIRM       ARTHUR G. LASH, ESQ.
502 Carnegie Center
Suite 103
Princeton, NJ 08540

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## DECISION AND ORDER

          It is sometimes said that an old dog cannot be taught new tricks.  In

some instances, there may be a modicum of truth to the saying; the inertia

that comes with time and experience can sometimes prove a powerful

resistence to change and the implementation of new ideas and

techniques.  It does not necessarily follow, however, that in an

employment setting age is a reliable barometer of performance and an

employee's receptiveness to change and direction.  Congress enacted the

Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*,

to combat reliance by employers upon the stereotypical view that older

workers are less capable than their younger counterparts when making

employment decisions.   As the Supreme Court has noted,

> [i]t is the very essence of age discrimination for an
> older employee to be fired because the employer
> believes that productivity and competence decline
> with old age. . . . Congress' promulgation of the
> ADEA was prompted by its concern that older
> workers were being deprived of employment on the
> basis of inaccurate and stigmatizing stereotypes.

*Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S. Ct. 1701, 1706

(1993) (internal citation omitted).  When employment decisions are

swayed by such thinking, an employee's rights under the ADEA are

violated.  This is such a case.

Plaintiff Thomas Ferguson, who for more than six years prior to

September of 2004 served as the Controller of a plant operated by

2

defendant Lander Co., Inc. ("Lander") in Binghamtom, New York, has

commenced this action against his former employer asserting federal and

state law claims arising from his discharge by the company, slightly more

than a year after acquisition of the company's assets by a new

management group.  Plaintiff asserts that the termination of his

employment was motivated by his age, in violation of both the ADEA and

the New York Human Rights Law ("HRL"), N.Y. Executive Law § 290 *et*

*seq.*, and additionally that it was prompted by his filing in August of 2004

of a request for leave under the Family and Medical Leave Act of 1993

("FMLA"), 29 U.S.C. § 2601 *et seq.*, to permit him to assist in the medical

care of his son.  Defendant vehemently denies having violated plaintiff's

rights under those three statutory provisions, and asserts that the loss of

his employment with the company resulted from a combination of the need

to trim the company's workforce, in order to reduce expenses and meet

the demands of its primary lender, and plaintiff's subpar job performance.

Plaintiff's claims were tried to the court, beginning on February 4,

2008.[1]  Based upon the evidence adduced at trial, I find that while

Ferguson's filing of a request for FMLA leave did not influence defendant's

---

[1]     This matter is before me based on consent of the parties, pursuant to 28 U.S.C. § 636(c).  *See* Dkt. No. 47.

determination, plaintiff has established by a fair preponderance of the evidence that age was a motivating factor in the decision to terminate his employment, and therefore conclude that he is entitled to much of the relief now sought.  The following decision incorporates within it my findings of fact and legal conclusions regarding the matter.

I.      BACKGROUND

Plaintiff was born on September 9, 1948, and for some thirty-six years has been married to Geraldine Ferguson.  While plaintiff lives during the week in an apartment in Harrisburg, Pennsylvania, where he is presently working, the plaintiff and his wife have maintained a residence in Scranton, Pennsylvania for the past thirty-one years, including during the time of his employment with Lander.

Plaintiff holds a Bachelor of Science Degree in Business Administration (Accounting) from the University of Scranton, and a Masters in Business Administration ("MBA") degree in the field of Finance from Marywood University.  Prior to becoming employed at Lander, Ferguson worked extensively in the area of finance and management, including at Ingersoll-Rand Corporation in Scranton, Pennsylvania, from 1973 until 1981, where he held several positions including as Accounting

4

Supervisor, Manager, and Financial Control Manager, and later with

Chamberlain Mfg. Corp., also located in Scranton, Pennsylvania, from

1981 until 1996, serving as Controller of that company for the last ten

years of his employment there.  After leaving Chamberlain, Ferguson was

employed for two years by Highlights for Children, Inc., a family owned

children's magazine and book publishing company located in Honesdale,

Pennsylvania, as the company's Director of Business Operations.

At the times relevant to plaintiff's claims, Lander was a corporation

engaged in the business of manufacturing health and beauty care

products, an industry affecting interstate commerce, with corporate

headquarters located in New Jersey.[2]  Because Lander does, and at all

applicable times did, employ at least fifty individuals for each working day

in each of twenty or more calendar weeks in the preceding year, it was

therefore an employer as defined under the ADEA, FMLA, and HRL, and

therefore subject to the requirements of those enactments.

---

[2]      In or about 2006, subsequent to the termination of plaintiff's employment
with Lander, the company's name, at least insofar as its Binghamton, New York
operation is concerned, was changed to Ascendia Brands Co., Inc.  Although this fact
is seemingly not relevant to the claims and defenses in this action, and it appears that
following the name change the former management group continued its ownership and
oversight of the company's operations, the record does not disclose either the reason
for the metamorphosis or whether it resulted from any significant corporate
restructuring.

In recent years, Lander's manufacturing activities have been chiefly concentrated at two facilities, one located in Binghamton, New York, where in excess of two hundred workers are stationed, and a second situated in Toronto, Ontario, where approximately eighty individuals are employed.[3] With approximately 125,000 square feet of operating space, the plant in Binghamton was the larger of the two Lander manufacturing facilities, and the sales out of the Binghamton operations, on average, were three times those attributable to its Canadian counterpart.

In April of 1998, Ferguson was hired by John Boylan, Lander's Chief Financial Officer ("CFO"), as the Plant Controller for the company's Binghamton manufacturing facility. At the outset of his employment with the company, plaintiff's base salary was established at $75,000 per year, with an additional yearly travel allowance of $3,000 to account for the fact that Ferguson resided in Scranton, Pennsylvania, approximately one hour in driving time from the Binghamton plant, and intended to commute to work daily rather than relocating with his family to the Binghamton area. In his position at Lander, plaintiff did not have a written employment

---

[3]     The company also once ran a third manufacturing operation, located in Cameron, California. That plant closed, however, when the company lost a major contract with Clairol, which prior to that time had generated most if not all of the California plant's business.

6

contract.  In the early years of his employment with the company, plaintiff enjoyed a good relationship with CFO Boylan, and received generally positive written evaluations from him in July of 1999, and again in August, 2000.

In June of 2003 the Hermes Group, LLC ("Hermes") purchased some of Lander's assets from Claneil Enterprises, the company's previous owner.[4]  During the years immediately prior to the Hermes takeover, Lander, which operates in an industry known for its modest profit margins, was generally unprofitable.  Of those years, only in the year 2000 did the company's books not reflect a loss.

The primary lender for Lander during the time of the Hermes operation was the CIT Group/Business Credit, located in New York City. At the times relevant to plaintiff's claims, the company management was under pressure from CIT to initiate measures calculated to effectuate

---

[4]     The corporate structure of Lander and Hermes, including the precise relationships among the Binghamton and Toronto plant operations and corporate headquarters, was not clearly developed at trial.  There was reference, for example, to participation on the part of a corporation identified as Hermes Acquisition Company I, LLC.  The record does not disclose, however, the relationship between that company and Hermes Group, LLC.   The parties' agreement that at the relevant times Lander remained plaintiff's employer, and retains liability in the event of a finding of discrimination, obviates the need to address these corporate intricacies, at least for purposes of the issues now before the court.

substantial cost savings.

As a result of the Hermes acquisition a new group, which included some of the Hermes investors, assumed responsibility for management of Lander.  In June of 2003, during that transition, Mark Massad assumed the position of the company's Senior Vice President for Finance and CFO, replacing John Boylan, who left Lander at or about the time of the acquisition.  Other executives joining Lander in or about that same timeframe included Joseph Falsetti, Chairman and Chief Executive Officer ("CEO"); Frank Pettinato, Senior Vice President for Operations; Bill Acheson, Executive Vice President for Sales and Marketing; and Harrie Driessen, Executive Vice President for International Sales.

As part of the restructuring John Nabial, an individual with significant accounting and management background in both public accounting, and in the private sector as a management consultant, was appointed in or about April of 2003 to fill a newly-created position of Corporate Controller, designated in the reporting structure to be between the CFO and the Plant Controllers at Binghamton and Toronto.  From June of 2003 until the termination of plaintiff's employment on September 17, 2004 Nabial, who at the time was in his mid-forties, served as Ferguson's immediate

supervisor.[5]

Immediately prior to the plaintiff's layoff there were two Lander workers reporting directly to him, including Steven Hess, hired by Ferguson in August of 2003 as a Cost Accountant, and Lisa Wascalis, an Accounts Payable Clerk.  In June of 2004 plaintiff was asked by Tara Di Bari, the company's Human Resource ("HR") Director, to evaluate those two directly-reporting employees, utilizing the standard Lander exempt employees performance planning and review form used earlier by John Boylan to complete plaintiff's evaluations in 1999 and 2000.  Plaintiff complied with that directive and, in accordance with established company procedures, completed those evaluations and discussed the results with the two employees.

In his position, plaintiff had primary responsibility for oversight of all financial aspects of the Lander operation at Binghamton. Plaintiff's duties as Plant Controller were summarized as follows in a written job description for the position:

> Responsible for directing, coordinating and
> controlling the accounting systems that properly

---

[5]     Nabial's employment with the company was terminated in May of 2005; Nabial was not informed as to the reason for the termination.

reflect the financial position of the Binghamton
plant.  Monitors policies and procedures and
recommends improvements.  Consults with the
Management Team on all business issues and
policy considerations.  Participates in establishing
and implementing major goals and objectives.
Serves as a resource in all aspects of operations.
Ensures accurate internal and external recording
and reporting financial transactions.  Directs and
oversees budget development and composition of
a $12 million divisional operation.  Oversees
accounts payable in excess of $36 million annually;
fixed asset request, development, management
and control. Ensures accuracy of inventory cost
issues for $5.6+ million inventory.  Ensures that
operational activities are in accordance with the
established legal, regulatory and Company
procedures in support of 60-80,000,000 sales.

In addition to his day-to-day duties as Plant Controller, during the

late 2003 and early 2004 timeframe plaintiff was also involved in three

significant company projects.  The first of those was the implementation of

a new cost accounting system.  That project, the result of a major

corporate initiative to be implemented companywide, involved allocation of

overhead and other costs on a "granular" basis in order to permit a better

understanding of the costs associated with the manufacture of the

approximately three hundred fifty individual products, or stock keeping

units ("SKUs"), being sold at the time by Lander.  The avowed purpose of

developing a new cost system was to calculate more definitively the

expense of manufacturing each product line in order to position the company to determine profitability and value in the marketplace, and to more efficiently utilize manufacturing capacity.

The cost accounting project involved corporate representatives as well as a cluster of employees from each of the two Lander plants.  At Binghamton, the group was comprised of the plaintiff, Stephen Hess, Robert Reardon, and Daniel Polhamus.  The Canada team included Albert Au-Yueng, the Toronto Plant Controller, and Joe Earles.  Weekly meetings were held during the course of the new cost system development, which extended from September of 2003 into March of the following year; those meetings were typically conducted by teleconference, and involved members of the two teams and the New Jersey headquarters coordinators, including Tony Todaro, the company's Manager of Business Systems, Nabial, and Ted Doyle, a Hermes investor who served as a consultant in connection with the endeavor.  During the course of the project, in which the plaintiff was heavily involved, the Binghamton team was consistently on schedule with its assigned tasks – unlike the Toronto group, which appeared to lag behind – and those at corporate headquarters, including John Nabial, seemed pleased and expressed

11

satisfaction with the Binghamton team project results.[6]

The second of the major projects in which Ferguson was engaged was preparation of a yearly budget for the Binghamton plant.  Between approximately September of 2003 and January, 2004, plaintiff was heavily involved in preparation of the Binghamton budget for the fiscal year ending 2005 ("FYE '05") budget, to cover the period between March 1, 2004 and February 28, 2005.  Unlike its Canadian counterparts, whose budget for that period was fifty-four days late, the Binghamton budget team completed its work for the FYI '05 budget on time, and representatives of corporate headquarters expressed appreciation for plaintiff's work in connection with the project.

The third project of significance completed under the plaintiff's auspices during the relevant timeframe was the Binghamton plant inventory, which occurred in February of 2004 and entailed inventorying of plant assets exceeding twelve million dollars in aggregate value.  That inventory, which was completed on time and successfully, was conducted in February of 2004, requiring a plant shutdown and coordination by the plaintiff of the work of between forty and sixty-five employees working in

---

[6]      Nabial himself testified that he considered the cost system project a success.

conjunction with the company's auditors, who were also present.  Plaintiff worked closely with Robert Reardon, the Supply Systems Manager at Binghamton, in connection with the 2004 inventory.  By all accounts, the 2004 inventory was similarly successful, and completed without complication.[7]

In his position as the Binghamton Plant Controller plaintiff worked closely with Mark Watkins, the Plant Manager of that facility.  Watkins, who is still employed with the company, reported to Frank Pettinato, the company's Senior Vice President for Operations, following the Hermes takeover in 2003.  As the Binghamtom Plant Manager Watkins had daily contact with Ferguson, and both men considered the plaintiff to have a dotted line reporting relationship with Watkins as Plant Manager.[8]  Watkins worked closely with Ferguson in formulating the budget for FYE '05 as well as on creation of the revised cost accounting system, and from what

---

[7]     Reardon testified that during the course of that project, plaintiff performed capably.

[8]     The informal reporting relationship between the plaintiff and Watkins, and the fact that in his absence Watkins typically designated Ferguson as his assistant, and thus in charge of the operations of the plant, became a matter of concern for the new Lander management.  At some point Watkins was instructed by his superiors at the company headquarters to discontinue the practice.  Among the impressions formered by the new management, following the Hermes acquisition, was that the plaintiff was spending too much time on plant operational issues, to the exclusion of his financial responsibilities.

Watkins was able to observe while in attendance at meetings, it appeared to him that Nabial appreciated plaintiff's efforts in connection with those projects.  Based upon his observations, Watkins had confidence in plaintiff's capabilities and judgment.

In addition to Watkins, other members of the Binghamton Plant management team generally held the plaintiff in high regard during his tenure at Lander, including Supply System Manager Reardon, Mixing and Production Manager Daniel Polhamus, Human Resources Manager Joan Lieb, and Cost Accountant Hess.  Plaintiff was not similarly respected, however, by Accounts Payable Clerk Wascalis, one of his direct reports, who considered him completely incompetent and unapproachable in his position as a Plant Controller, and as her supervisor.

From the time of the Hermes acquisition until June of 2004, Ferguson had overall positive interaction with those at corporate headquarters, including with John Nabial, receiving generally favorable feedback regarding his performance during that period, although with some exceptions.  Over that period Nabial occasionally commended the plaintiff for his work on the various major projects, including his role in the development of a new cost accounting system, the preparation of the FYE

14

'05 budget, and the inventory, and did not counsel the plaintiff in writing regarding the need to improve his performance or issue any written memoranda to apprise Ferguson that he was not performing up to Nabial's expectations.

This is not to say that there were no problems discerned with regard to plaintiff's job performance during that timeframe.  In May of 2004 a question arose regarding discontinued items, with Nabial directing the plaintiff to complete a required worksheet.  An earlier e-mail exchange in January of 2004 between Ferguson and Nabial also raised an issue regarding product invoiced, but not shipped.  Additionally, concern was expressed at various times, by some, over whether the plaintiff had adequate command of BPCS, a resource planning computer software program utilized at the Binghamton facility to track costs.[9]  Plaintiff was also criticized, at some point in or about the summer of 2004, for his resistance to a corporate wide initiative to extend out the period for making payments to vendors in order to alleviate a cash flow deficit, a matter of

---

[9]      Although the record is somewhat unclear on this score, it appears that this issue surfaced after Nabial's decision to recommend plaintiff's discharge was made.

15

concern to corporate headquarters.[10]  Nabial admitted, however, that most of those issues were not referenced in plaintiff's personnel file, nor did they appear to recur or evoke lingering concerns over plaintiff's job performance.[11]

One area of criticism by Nabial related to a vacation taken by Ferguson in early July, 2004 without first having sought his approval, as plaintiff's supervisor.  In scheduling that vacation Ferguson followed the established practice at Binghamton, noting his scheduled vacation on a master calendar maintained at the plant.  While a memorandum was issued at the direction of higher management by Joan Lieb, the company's

_____

[10]     Plaintiff's concerns over the new policy related in part to the fact that vendors typically sold products to Lander on the basis that payment was due within thirty days, and thus might refuse to continue supplying goods if payment was not made within that time.  Plaintiff also questioned whether it was not more advantageous to the company in the end to take advantage of cash discounts for early payment, as opposed to deferring payment beyond the prescribed thirty-day period.

[11]     While there was some testimony offered at trial regarding plaintiff allegedly having sometimes slept during working hours, taken excessive lunch hours, and left work early on occasion, there was no corresponding indication provided that those comments were relayed to company decision-makers, including notably John Nabial and Joseph Falsetti.  Accordingly, since the court does not understand defendant to be asserting, as a defense, the fact that based upon evidence uncovered since September 17, 2004 it would have terminated plaintiff's employment even but for age discrimination, based upon legitimate non-discriminatory reasons, see Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000); Tarshis v. Riese Org., 211 F.3d 30, 36 (2d Cir. 2000), I have not considered these allegations as supplying a legitimate basis for the decision to discharge the plaintiff.

HR Manager at Binghamton, regarding vacations and specifically directing employees to seek prior approval from immediate supervisors for vacation scheduling, a procedure not followed on that occasion by the plaintiff, that memorandum was not issued until July 1, 2004, while he was in fact already on vacation.  In any event, it was not until July 9, 2004, well after he had already made his recommendation regarding plaintiff's termination, that Nabial raised the vacation scheduling issue, to which plaintiff responded by apologizing, noting that he had simply followed the established practice of scheduling his vacation on the internal Binghamton Lander calendar.[12]

Nabial testified that he became dissatisfied with plaintiff's performance beginning near the end of 2003 or very early during the following year.  By May or June of 2004, Nabial formed the impression that plaintiff's employment at Lander should be terminated.  According to Nabial, that opinion was based in part upon performance, including his inability to obtain desired financial information from the plaintiff, as well as his belief that a Plant Controller was no longer needed at Binghamton.

---

[12]     That apology from the plaintiff, which came by e-mail, led Nabial to blind copy Tara Di Bari on an e-mail sequence between himself and Ferguson regarding the issue, and to add the comment "Whimper! Whimper!".

Since Nabial was not empowered to make the decision to terminate plaintiff's employment, however, he therefore recommended the change to CFO Mark Massad.  Discussions ensued, involving Tony Todaro and Frank Pettinato, regarding the issue.  As a result of those discussions Nabial was told by President, Chief Executive Officer ("CEO") and Board Chair Joseph Falsetti that the matter would be deferred in order to permit plaintiff's termination, if it was to occur, to coincide with a contemplated reduction in force.

    In anticipation of completing an evaluation concerning Ferguson,  on or about June 11, 2004 John Nabial initiated a process for acquiring information concerning the plaintiff's job performance.  As part of that exercise Nabial sought input from Tony Todaro, the company's Manager for Business Systems; Ken Mitchell, the Assistant Controller for Lander; Mark Watkins, the Plant Manager at Binghamton; Renee Juro, a Senior Accountant assigned to work at corporate headquarters; Steven Hess, the Cost Accountant working under the plaintiff at Binghamton; and Lisa Wascalis, also working at Binghamton under plaintiff's supervision as an Accounts Payable Coordinator.  In seeking information from employees who did not directly supervise the plaintiff, Nabial departed from the

established procedure at Lander for evaluating management level employees, utilizing forms which were also not consistent with the traditional evaluation process at Lander.  Each of the individuals whose opinions were solicited was asked to complete a form entitled "Performance Management Input Form – 360 Feedback" and was advised that comments regarding the plaintiff's performance were being solicited on an anonymous basis.[13]  Plaintiff was the only Lander employee evaluated utilizing this process in 2004, and company officials were only able to recall one other employee, Beth Chapin, who was evaluated using the 360 mechanism, that having occurred in 2003.

In response to this request for input, only Watkins, Todaro and Mitchell completed and returned written 360 feedback forms.[14] The 360 evaluation completed by Binghamtom Plant Manager Watkins was generally complimentary of the plaintiff.[15]  In his evaluation Tony Todaro

---

[13]     This process was occurring at the same time that Thomas Ferguson, as well as others within the Finance Department, including Ken Mitchell, Renee Juro and Albert Au-Yeung, were being asked to evaluate the employees directly supervised by them, using the traditional exempt employees-performance planning and review form typically employed at Lander.

[14]     While at trial Di Bari recalled having seen a written 360 evaluation of the plaintiff completed by Renee Juro, who is no longer employed at Lander, defendant has been unable to locate any such form completed by her.

[15]     During his testimony at trial, Watkins candidly agreed that while he was satisfied with plaintiff's performance locally, he had no way of knowing whether the

expressed some criticism of the plaintiff, noting his view that the two employees working directly under him were not "comfortable" with his leadership, and suggesting that the plaintiff devote his attention less to assisting Watkins in managing the plant and more toward fulfilling his responsibilities as Plant Controller.[16]  Ken Mitchell's 360 evaluation was significantly less flattering toward the plaintiff, suggesting that with the possible exception of coordinating the year-end physical inventory, he was not aware of any area in which Ferguson was particularly effective.  It should be noted, though, that while Mitchell's evaluation of the plaintiff was undeniably negative, and significantly at odds with that of Plant Manager Watkins, many of his responses reflected "don't know" and, in the comment section, Mitchell stated in effect that he was unsure as to what the plaintiff exactly did at Lander, reflecting the reality that the extent of Ken Mitchell's interaction with the plaintiff was fairly limited.

In addition to the written 360 evaluations of the plaintiff completed by

---

plaintiff met the company's expectations as a Plant Controller.  Watkins also testified, however, that he was unaware of any complaints from corporate officials regarding plaintiff's job performance.

[16]     It should be noted that in 2004 Todaro was not a member of the company's finance department, although in his position of Business Systems Manager he traveled to Binghamton approximately six times per year, and had substantial interaction with the plaintiff.

Watkins, Todaro, and Mitchell, at trial Lander offered into evidence 360 feedback forms completed by Nabial, allegedly based upon telephone interviews conducted on June 15, 2004 with Lisa Wascalis, who apparently was hesitant to complete a written evaluation out of concern that Ferguson might learn of her as the source of information gathered by Nabial, and Steven Hess, who had flatly refused to complete a 360 evaluation form regarding the plaintiff in light of the fact that the request represented a departure from the company's established practice for evaluating exempt employees.  The form completed by Nabial utilizing verbal input received from Lisa Wascalis, which was significantly critical of the plaintiff's performance,  is consistent with that individual's trial testimony regarding her assessment of plaintiff's performance and her comments to Nabial regarding Ferguson.  The 360 feedback form attributed to Hess, however, is wholly at odds with his trial testimony regarding his opinions of the plaintiff.

The first page of the 360 evaluation form, utilized by Nabial to capture the verbal comments of Wascalis and Hess, sets out fifteen separate categories and requests a numerical rating in each, using the following code:

| Numerical Rating | Designation |
|---|---|
| 0 | Don't know |
| 1 | Never |
| 2 | Sometimes |
| 3 | Often |
| 4 | Always |

The form inquires about such employee attributes as "[b]ehaves in a way which is respectful of others", "[s]hares credit for team accomplishments", and the like.  According to Nabial's written summary, Hess rated Ferguson as a "1" – the lowest rating aside from "don't know" – in thirteen of the fifteen designated categories, and a "2" in the remaining two. Nabial's report of Hess's verbal evaluation also contains several negative comments in an explanation portion located on the second page of the feedback form.

Hess testified credibly at trial that Nabial's reporting of his verbal comments on the written 360 form did not accurately reflect his actual opinions regarding plaintiff's job performance, both as held and as shared with Nabial.  Indeed, in contrast to the opinions attributed to him by Nabial, Hess testified at trial that for the most part he was extremely complimentary toward the plaintiff, and would have scored Ferguson as a "3" in three categories on the form, and in the highest category in the

22

remaining twelve.[17]

On June 18, 2004, based upon the written and verbal comments gathered, Nabial prepared a written evaluation of the plaintiff utilizing the standard Lander exempt employee evaluation form.  The first portion of that form seeks an assessment of the employee's competence in various specified realms, listing possible responses as "exceeds expectations" "commendable", "effective", "marginal", and "unacceptable".  The evaluation authored by Nabial set forth the following ratings for the plaintiff in the respective designated categories:

| Category | Rating |
|----------|--------|
| Professionalism | Unacceptable |
| Accountability | Marginal |
| Flexibility | Marginal |
| Technical/Occupational Knowledge | Effective |
| Initiative | Unacceptable |
| Planning | Effective |
| Communication | Marginal |
| Judgment | Marginal |
| Problem Solving | Marginal |
| Innovation and Risk Taking | Unacceptable |
| Internal/External Customer Service | Unacceptable |
| Negotiating Skills | Unacceptable |

---

[17]     Interestingly, a comparison of the 360 feedback forms completed by Nabial, based upon his alleged conversations with Wascalis and Hess, reflects that in the fifteen categories set forth on the first page, the responses listed on both are identical in all respects.

The form concluded with an overall rating of "unacceptable".

John Nabial traveled to Binghamton to visit the Lander plant there in June of 2004.  One of the purposes of that visit was to meet with the plaintiff to discuss his evaluation.  Nabial and the plaintiff, along with others from the company, played golf together on June 17, 2004.  During that outing, there was no discussion regarding plaintiff's performance, and he was given no reason to believe that Nabial was dissatisfied with his work.  On the following day, however, Nabial met with the plaintiff and presented Ferguson with his highly critical written evaluation.  Following the meeting plaintiff refused a request that he sign the evaluation, indicating his disagreement with its contents, and later provided an e-mail with a comprehensive, written response to its points.

Prior to receiving Nabial's evaluation, plaintiff had received no indication that his job at Lander was in jeopardy, nor had he received any counseling memoranda, written reprimands, or other form of official notification of dissatisfaction by his superiors with his job performance.  While that evaluation appears to have given the impression that the situation could be salvaged, setting forth several developmental and performance objectives for the coming year, and adding that "Tom needs

24

to address the comments in this Performance Planning and Review Form immediately in order to achieve an acceptable level of performance expected from the plant controller position", it is clear that by June of 2004 Nabial had concluded to the contrary, and that from that point both he and Di Bari began building a file regarding the plaintiff and his performance with the expectation that his employment with the company would eventually be terminated.[18]

On August 10, 2004, plaintiff submitted a written request to company officials for intermittent, unpaid leave under the FMLA.  The announced purpose of that leave was to permit Ferguson to care for the needs of his seventeen year old son, who has been diagnosed as suffering from several serious medical conditions which, on a cyclical basis, have both required continuous medical treatment and involved the occasional need for court intervention.[19]  While plaintiff's leave application was initially

_____

[18]    There are indications in the record strongly suggesting that as early as the time Nabial sought input regarding plaintiff's performance from his co-workers he had already formed an opinion that Ferguson should be fired.  That John Nabial had given strong consideration to terminating the plaintiff's employment prior to that time is demonstrated, for example, by the fact that on June 10, 2004 Tara Di Bari responded to an apparent, earlier request by Nabial for an indication of what amount of severance pay would be due to the plaintiff upon termination.  In addition, at some point in the June, 2004 timeframe Nabial gave instruction to the Lander Director of Information Systems, Simon Brown, to track plaintiff's computer usage.

[19]    The parties have stipulated that at the relevant times plaintiff's son suffered from a serious health condition, as that term is defined under the FMLA.

granted by local HR Manager Joan Lieb, that decision was later rescinded, at the direction of corporate management, and plaintiff was asked to provide a medical certification regarding his son's condition to support the request.

On or about September 1, 2004, plaintiff provided Joan Lieb with the requested medical certification to support his FMLA application.  That certification was subsequently forwarded by Lieb to Tara Di Bari on or about September 2, 2004.  On September 16, 2004, not having heard anything further regarding the request despite having provided the certification, plaintiff pressed the matter with Lieb.  As of the date of his discharge on September 17, 2004, plaintiff had received no formal, written response to his FMLA leave request from the company.[20]

---

[20]     At trial Lander went to great lengths to prove that an e-mail communication was sent by Di Bari to Lieb on September 3, 2004, instructing her to approve plaintiff's leave request.  Neither Di Bari nor Lieb, however, could recall that e-mail having been exchanged.  While I find the testimony offered by the defendant regarding retrieval of the alleged Di Bari e-mail from the Lander computer system and Lieb's desktop computer not to be credible, I find it unnecessary to resolve the factual discrepancies surrounding that e-mail.  It is uncontroverted that the company never responded to the plaintiff in writing formally granting or denying the FMLA request once the initial verbal approval by Lieb had been rescinded and plaintiff provided the necessary medical certification.  While company management *may* have instructed HR Manager LIeb to grant the request, and Lieb *may* have negligently failed to follow Di Bari's alleged directive that she inform Ferguson his FMLA leave request was granted, this circumstance is legally irrelevant.  The fact is that the approval was never communicated from the company to the plaintiff, thus establishing at least a technical violation of the Act, as will be seen.  *See* pp. 56-57, *post.*

On September 17, 2004 Lander implemented a companywide reduction in force ("RIF").  The avowed purpose of that reduction was to effectuate cost savings and allow the company to meet the demands of its primary lender.  In anticipation of that RIF, a list of the employees to be laid off as part of the program was developed, beginning in or about August of 2004.  That list, which evolved over time, was maintained by Joseph Falsetti, the Board Chairman and CEO of Lander, on a jump drive accessible only to himself, Tara Di Bari, and Frank Pettinato, the Company's Senior Vice President for Operations.

While it is unclear precisely who made the final determination as to which employees would be affected by the RIF, it appears that the recommendations leading to the resulting terminations were made by various department managers.  The evidence at trial was particularly equivocal concerning who made the final decision to include the plaintiff and Ms. Seshadri in the RIF and terminate their employment.  Although he testified at trial that he agreed with it, Frank Pettinato stated that he did not make the decision.  According to Pettinato the conclusion that the two should be laid off was reviewed by Nabial and Mark Massad, the company's Senior Vice President for Finance and CFO.  During his

27

testimony, however, Nabial testified only to having made a recommendation that plaintiff's employment be terminated, but not having participated in the decision itself.

The Lander employees whose positions were eliminated in connection with the September 17, 2004 RIF included the following:

| Name | Title | Department | Age |
|------|-------|-----------|-----|
| Susan Jenkins | Administrative Asst. | Executive | 42 |
| Brett Philbin | Marketing Coordination | Marketing | 24 |
| Barbara Welsh | Customer Srvc. Repres. | Customer Service | 57 |
| George Bohackyj | Int'l Sales Assistant | International Sales | 54 |
| Tom Ferguson | Plant Controller | Finance | 56 |
| Chuck Hunter | Production Supervisor | Production | 52 |
| Troy Strause | Health & Safety Coordinator | Human Resources | 36 |
| Carol McGowan | Receiving Association | Receiving | 44 |
| Nate Adekoya | Quality Control Technician | Quality Control | 58 |
| Diana Rhynehart | Sample Associate | Shipping | 51 |
| Christina Graham | MRP Scheduler | Scheduling | 55 |
| Steven Vaughn | Plant Engineer | Production | 48 |
| Ranga Seshadri | Cost Accounting | Finance | 55 |
| Diane D'Anna | Quality Assurance Tech. | Quality Assurance | 35 |
| Shyam Aryal | Research & Develop. Assoc. | Research & Develop. | 33 |
| Wayne Serre | Purchasing Supervisor | Purchasing | 50 |

28

As can be seen, of the sixteen employees impacted by the RIF, ten were forty-eight years of age or older.  Only two employees previously assigned to the finance department, including the plaintiff and Ranga Seshadri, were affected by the layoff; both of those individuals were over the age of fifty at the time.

Prior to the September 17, 2004 layoffs, the finance department at Lander consisted of the following personnel:

| Name | Title | Age |
|------|-------|-----|
| Mark Massad | Chief Financial Officer | Under 50 |
| John Nabial | Corporate Controller | Mid-40s |
| Rene Juro | Senior Accountant | 38 |
| Arleiga Crate | Staff Accountant | 39 |
| Kenneth Mitchell | Assistant Controller | 33 |
| Ulyana Kanitska | Accounting Clerk | 23 |
| Teena M. Utter | Accounts Receivable Manager | 58 |
| Karen Martorelli | Payroll Clerk | 29 |
| Thomas Ferguson | Plant Controller-Binghamton | 56 |
| Lisa Wascalis | Accounts Payable Representative | 42 |
| Steven Hess | Cost Accountant | 45 |
| Albert Au-Yeung | Controller-Toronto | 46 |
| Carol Phillips | Accounts Receivable Clerk | 56 |

| Freijya Locaylocay | Accounts Payable Clerk | 37 |
| Nikki Lea | Order Entry/Invoicing Associate | 36 |
| Ranga Seshadri | Cost Accountant | 57 |
| Rocco Fazzolari | Accounting Supervisor | 37 |
| Lisa Pastrenak | General Accounting Supervisor | N/A |

Prior to September 17, 2004 reductions, there was both a Plant Controller and a Cost Accountant assigned to the Binghamton and Toronto plants.  In Binghamton the Plant Controller, the plaintiff, was age fifty-six while the Cost Accountant, Steven Hess, was forty-five years old.  In Canada, by contrast, Albert Au-Yeung, the Plant Controller, at age forty-six, was the younger of the two, while Ranga Seshadri was fifty-five years old.  In both instances, as between those two categories the older worker was included within the RIF, while the younger one was retained.

Significantly, in contrast to the process utilized to measure plaintiff's job performance, Nabial did not request a 360 evaluation regarding Ferguson's Toronto counterpart, who he described as a competent plant controller.  While Au-Yeung served as the Controller of a much smaller plant than Binghamton, a fact which could arguably have made him more dispensable than the plaintiff once Nabial was hired to fill the new position of Company Controller, according to Nabial Au-Yueng was given far more

30

autonomy than the plaintiff, handling additional responsibilities such as collections, the entire budgeting process for the plant, and complicated Canadian tax and regulations matters not faced in Binghamton.

On September 17, 2004, plaintiff was asked to meet with Mark Watkins and Tara Di Bari.  Once in that meeting, Ferguson was informed that his position with the company was being eliminated and his employment would consequently be terminated, effective immediately. Plaintiff was then given a form release letter detailing the terms of his separation from Lander and offering him the opportunity to accept a severance package, in return for relinquishing any legal claims which he might assert concerning his termination.[21]  After being informed of the termination, plaintiff inquired whether the decision was based upon his job performance; in response, Di Bari indicated that it was not.[22]  When that meeting concluded, plaintiff was escorted from the building.  At the time of his termination plaintiff was fifty-six years of age, and was earning $88,504

---

[21]     The amount of severance offered to the plaintiff at the time of termination was the equivalent of seven weeks of salary.

[22]     Both plaintiff and Watkins testified that Ferguson made that inquiry.  Di Bari, however, does not recall having been asked such a question during the termination meeting, adding that if it had been posed she is not sure what her response would have been.  I have credited the testimony of the plaintiff and Watkins, and find that plaintiff did in fact make the inquiry, and received a response to the effect that his performance did not play a role in the decision.

annually.[23]

Following plaintiff's termination, and in light of the ensuing

unanticipated resignation of Steven Hess shortly thereafter, plaintiff's

position was not filled; instead, Ferguson's job duties were absorbed by

other finance department employees, including John Nabial (20%), Ken

Mitchell, the Assistant Company Controller (40%), and Renee Juro (40%),

who was the company's Senior Accountant.  All three of those individuals

are significantly younger than Ferguson.[24]  Plaintiff's responsibilities for the

Binghamton inventory were reallocated to Anthony Todaro, who at the

time was estimated to be between forty-three and forty-four years old.

Plaintiff was upset and embarrassed by the loss of employment at

Lander.  Part of the humiliation experienced by Ferguson in connection

with his termination stemmed from the need to reach out to friends and

acquaintances in order to elicit their assistance in finding a new position.

---

[23]     Apparently anticipating the possibility that his employment with the
company would be terminated, plaintiff had prepared a memorandum, which he
handed Di Bari during the meeting, directing that a copy of his personnel file be mailed
to his brother, who is an attorney.

[24]     At the time plaintiff's duties were reallocated, Ken Mitchell was
approximately thirty-three years old, and Renee Juro was thirty-eight years old.  Nabial,
who assumed the remaining portion of plaintiff's duties, was in his mid-forties at the
time.

According to his wife, plaintiff was devastated by the termination, acting "down in the dumps", appearing stooped over, and experiencing difficulty in sleeping.[25]  Despite having suffered emotionally as a result of the termination, however, there is no evidence in the record to suggest that plaintiff sought professional counseling or treatment as a result of the termination.

Following the termination of his employment in September of 2004, Ferguson engaged in a comprehensive effort to find a suitable new employment position.  In June of 2005, after having drawn twenty-six weeks of unemployment at a rate of $408 weekly, Ferguson was offered and accepted a position with the Pennsylvania State Treasury Department, at an annual starting salary of $75,000.  Because plaintiff's new work station was located in Harrisburg, Pennsylvania – approximately one hundred twenty-five miles from his home in Scranton – plaintiff leased an apartment in Harrisburg, generally commuting to and from the family home, where his wife continued to reside, on most weekends.  Plaintiff has since been promoted twice in that new position, and is now the Director of

---

[25]     Plaintiff's termination came at a time when plaintiff was already emotionally challenged based upon the difficulties experienced with his son's condition.

the Pennsylvania Bureau of Fiscal Review, an arm of the Treasury

Department, earning $104,000 per year.

II.    PROCEDURAL HISTORY

    A.    Administrative Filings

On or about November 4, 2004 plaintiff filed a complaint with both

the New York State Division of Human Rights ("NYSDHR") and the Equal

Employment Opportunity Commission ("EEOC"), asserting discrimination

on the basis of age stemming from the termination of his employment.

Plaintiff subsequently received a letter from the EEOC advising him of his

right to commence an action under the ADEA, and his complaint to the

NYSDHR has since been dismissed by that agency for administrative

convenience, thereby relieving the plaintiff of his election of remedies

under the New York HRL and permitting his pursuit in this action of a

pendent state law claim under that state law provision.  N.Y. Exec. Law §

297(9); *see Henderson v. Town of Van Buren*, 15 A.D.3d 980, 981, 789

N.Y.S.2d 355, 356 (4th Dep't 2005).  It does not appear that either of

those agencies conducted an investigation or made any findings with

regard to the legal sufficiency of plaintiff's complaint of discrimination.

    B.    This Action

Plaintiff commenced this action on March 14, 2006.  Dkt. No. 1.  In his complaint, which names Lander as the sole defendant, plaintiff asserts a claim of intentional discrimination on the basis of age, in violation of the ADEA; a parallel, pendent state law age discrimination claim under the New York HRL; and a cause of action for unlawful retaliation for having requested unpaid leave to allow him to care for his son, in violation of the FMLA.  *Id.*  Plaintiff's complaint seeks various relief including, *inter alia*, compensation for economic losses, including lost wages; compensatory damages for mental anguish and emotional distress; liquidated damages; and costs of the action, including reasonable attorneys' fees.  *Id.*  Issue was joined on May 19, 2006 by the filing of an answer on behalf of defendant Lander denying many of the material allegations of plaintiff's complaint, including that the decision to terminate his employment was motivated by his age or the filing of a request for medical leave, and additionally asserting various affirmative defenses.  Dkt. No. 7.

On April 30, 2007, defendant filed a motion seeking the entry of summary judgment dismissing plaintiff's claims as a matter of law.  Dkt. No. 25.  That motion, which was vigorously opposed by the plaintiff, *see* Dkt. No. 45, was denied following a hearing conducted on October 5, 2007

by bench decision in which I advised the parties of my finding of the existence of genuinely disputed, material issues of fact precluding the entry of summary judgment; that decision was memorialized by order issued on October 11, 2007.  *See* Dkt. No. 53.

The matter was subsequently tried to the court, without a jury, beginning on February 4, 2008.[26] At the close of the trial, decision was reserved.

III.   <u>DISCUSSION</u>

A.   <u>Jurisdiction and Venue</u>

The court has subject matter jurisdiction over the claims raised by the plaintiff under the ADEA and FMLA, pursuant to 28 U.S.C. § 1331, and I have found it appropriate, in the interest of efficiency and judicial economy, to exercise supplemental jurisdiction over plaintiff's pendent New York HRL claims in accordance with 28 U.S.C. § 1367.[27]  *See Jones*

---

[26]   At the request of the plaintiff, the matter was initially set down for trial by jury.  Both parties later waived the right to a jury trial, however, *see* Dkt. No. 62, and both that waiver and the parties' consent to my jurisdiction to adjudicate plaintiff's claims were reaffirmed on the record at the outset of the trial.

[27]   Since plaintiff is a citizen of Pennsylvania, and Lander is a Delaware Corporation with a principal place of business in New Jersey, and the amount in controversy appears to exceed $75,000, exclusive of interest and costs, this court also has an independent basis for asserting federal jurisdiction over plaintiff's HRL claim, pursuant to 28 U.S.C. § 1332.

v. Ford Motor Credit Co., 358 F.3d 205, 214 (2d Cir. 2004).  Venue in this action is properly laid in the Northern District of New York. 28 U.S.C. § 1391(b).

> B.    Liability

As a worker without a contract, during the time of his employment at Lander plaintiff was an at-will employee.  *See Junk v. Aon Corp.*, No. 07 Civ. 4640, 2007 WL 4292034, at *3 (S.D.N.Y. Dec. 3, 2007).  While under New York law, as an at-will employee, Ferguson was subject to discharge for any lawful reason, and at any time in the discretion of the employer, *see Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 300, 461 N.Y.S.2d 232, 235 (1983), he was nonetheless afforded legal protection against age discrimination and FMLA retaliation by overriding federal and state statutes which trump an employer's ability to deal freely with at-will employees.  *See Simon v. Manufacturers Hanover Trust Co.*, 849 F. Supp. 880, 883 (S.D.N.Y. 1994).  Accordingly, as will be seen, if the plaintiff has satisfied his burden of proving that his discharge by Lander was motivated by his age, or in retaliation for having requested family leave, he is entitled to available relief under those governing state and federal provisions, notwithstanding his at-will status.

37

1.    Age Discrimination

The legal principles governing plaintiff's federal and state law age discrimination claims are by no means controversial.  The ADEA makes it "unlawful for an employer. . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1); *see Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 141, 120 S. Ct. 2097, 2105 (2000).  To prevail, a plaintiff who, like Ferguson, alleges that he or she was discharged in violation of the ADEA must prove that the decision was the product of age discrimination – that is, that age was a motivating factor in the decision to terminate the employment relationship.[28]  *Reeves,* 530 U.S. at 141, 120 S. Ct. at 2105; *Donovan v. Milk Mktg., Inc.,* 243 F.3d 584, 585 (2d Cir. 2001).

The concept of motivating factor, as it applies in the age discrimination calculus, has been the subject of considerable judicial

---

[28]    Like the ADEA, the New York HRL prohibits an employer from discriminating against an employee on the basis of age.  N.Y. Exec. Law § 296; *see Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  "Since the New York Human Rights Law statute mirrors the requirements of the ADEA, violation of one necessarily implies violation of the other."  *Abrahamson v. Board of Educ. of Wappingers Falls Cent. Sch. Dist.*, 374 F.3d 66, 70 n.2 (2d Cir. 2004)

refinement.  In order to establish a violation of the ADEA, the plaintiff must demonstrate that his or her age "actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S. Ct. 1701, 1706 (1993); *see also Reeves,* 530 U.S. at 141, 120 S. Ct. at 2105. While the requisite showing which must be made concerning the degree to which age has influenced the decision-making process has been variously stated, it appears that for a violation to have occurred, it must have had a "motivating" or "substantial" role in the adverse employment action under challenge.  *Reeves*, 530 U.S. at 141, 120 S. Ct. at 2105; *Donovan,* 243 F.3d at 585; *see also Farulla v. New York Sch. Constr. Auth.,* 277 F. Supp. 2d 140, 146 (E.D.N.Y. 2003) ("Age must be shown to have been a 'motivating factor' for the discharge, but it need not have been [the] only or the primary reason for the discharge.") (*citing Owen v. Thermatool Corp.,* 155 F.3d 137, 139 (2d Cir. 1998)).  As the Second Circuit has noted,

> it is well settled that an ADEA plaintiff need not prove that age was the only or even the principal reason for the complained-of employment action.  Rather, the plaintiff is entitled to prevail if [he or] she demonstrates that [his or] her age played a motivating role in, or contributed to, the employer's decision.

*Renz v. Grey Advertising, Inc.,* 135 F.3d 217, 222 (2d Cir. 1997) (citing,

*inter alia, Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir. 1995);

*see also Owen,* 155 F.3d at 139 (finding that terms "substantial" and

"motivating" are "reasonably interchangeable or at least have considerable

overlap" and concluding that the ADEA requires that age need only be one

of the considerations motivating the employer's decision, but need not be

the only reason or even the primary reason).

This case represents a departure from the typical single plaintiff age

discrimination case involving an isolated discharge, in that plaintiff's

termination coincided with a company-wide lay off.  While the law permits

an employer to reduce its workforce in order to effectuate cost savings or

based upon other legitimate business considerations, such a reduction

does not insulate it from claims of intentional discrimination under the

ADEA.  When age is a motivating factor in the selection of an employee

targeted for layoff during the course of a RIF, the employer has unlawfully

discriminated on the basis of age.[29]  *Maresco v. Evans Chemetics,* 964

F.2d 106, 111 (2d Cir. 1992); *Cronin,* 46 F.3d at 204; *see also Hagelthorn*

---

[29]      An employer which implements a reduction in force using objectively
neutral criteria, but with a resulting consequence skewed against older workers, can be
held accountable for age discrimination on a theory in the past often referred to as
disparate impact.  *See, e.g., Meacham v. Knolls Atomic Power Laboratory,* 461 F.3d
134, 139-40(2d Cir. 2006).  Because the plaintiff in this case has disavowed reliance
upon this theory, I have not considered the case from a disparate impact standpoint.

*v. Kennecott Corp.*, 710 F.2d 76, 81 (2d Cir. 1983) ("[E]ven during legitimate reorganization or workforce reduction, an employer may not dismiss employees for unlawful discriminatory reasons.").

Though not officially endorsed by the Supreme Court for use in ADEA cases, *see Reeves,* 530 U.S. at 142, 120 S. Ct. at 2105-06, various other courts, including the Second Circuit, have generally approved the use of the framework articulated by the Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973), and later reiterated and refined in *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1092-93 (1981) and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S. Ct. 2742, 2746-47 (1993), for analysis of age discrimination claims.[30]  *See, e.g., Abrahamson v. Bd. of Educ. of Wappingers Falls Cent. Sch. Dist.,* 374 F. 3d 66, 71 (2d Cir. 2004); *Tarshis v. Riese Org.,* 211 F.3d 30, 35-36 (2d Cir. 2000), *abrogated on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992 (2002); *see also Miller Brewing Co. v. State Div. of Human Rights,* 66

---

[30]     While never directly adopting the *McDonnell Douglas* framework for use in disparate treatment cases under the ADEA, the Supreme Court has at least intimated its belief that the test could be appropriately employed in such a setting, *see Hazen Paper Co.,* 507 U.S. at 612, 113 S. Ct. at 1707, and assumed in *Reeves, arguendo,* that this was the case without squarely addressing the issue in light of the parties' agreement to that affect.  *Reeves,* 530 U.S. at 142, 120 S. Ct. at 2106.

N.Y.2d 937, 938-39, 498 N.Y.S.2d 776, 778 (1984).  Under the *McDonnell Douglas* protocol, a plaintiff must first establish a *prima facie* case of discrimination.  *Reeves,* 530 U.S. at 142, 120 S. Ct. at 2106; *Cronin,* 46 F.3d at 203; *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36 (2d Cir. 1994).  To make such a *prima facie* showing of age discrimination, a plaintiff who has been discharged must prove that 1) he or she belongs to a protected class – that is, that he or she is over the age of forty; 2) he or she was qualified for the position; 3) the plaintiff's employment was involuntarily or constructively terminated; and 4) the termination occurred under circumstances giving rise to an inference of discrimination.[31] *Tarshis,* 211 F.3d at 35; *see also Slattery v. Swiss Reins. Am. Corp.,* 248 F.3d 87, 91 (2d Cir. 2001); *Cronin,* 46 F.3d at 203-04.  The plaintiff bears the burden of proving the elements of a *prima facie* case by a preponderance of the evidence.  *Tarshis,* 211 F.3d at 35.

Upon establishment of a *prima facie* case, the burden of production is reallocated to the defendant, who at that juncture must come forward and articulate a legitimate, non-discriminatory reason for the termination.

---

[31]     The analysis varies slightly as to age discrimination claims under the New York HRL, which protects all workers against age discrimination, including those under the age of forty.  N.Y. Exec. Law § 296; *see also Park v. Seoul Broadcasting Sys. Co.*, No. 05 CV 8956, 2008 WL 619034, at *9 (S.D.N.Y. Mar. 6, 2008).

*Reeves,* 530 U.S. at 142, 120 S. Ct. at 2106; *Tarshis,* 211 F.3d at 36;

*Slattery,* 248 F.3d at 91.  Once the employer has successfully shouldered

this burden, the focus then returns to the plaintiff, who must establish that

the alleged non-discriminatory rationale offered did not genuinely prompt

the adverse decision, but is instead a mere pretext for discrimination.

*Reeves,* 530 U.S. at 143, 120 S. Ct. at 2106; *Burdine,* 530 U.S. at 253,

101 S. Ct. at 1093.  While under the *McDonnell Douglas* paradigm the

burden of production shifts back and forth between the parties, a plaintiff

claiming intentional discrimination is tasked ultimately with establishing

discrimination by a preponderance of the evidence.  *Reeves,* 530 U.S. at

143, 120 S. Ct. at 2106.

a)   *Prima Facie* Case

The burden of demonstrating a *prima facie* case of age

discrimination is not particularly onerous.  *Windham v. Time Warner, Inc.,*

275 F.3d 179, 187 (2d Cir. 2001).  In this instance, plaintiff easily meets

the first prong of the *prima facie* test, since he was well over the age of

forty at the relevant times.  *O'Connor v. Consolidated Coin Caterers Corp.,*

517 U.S. 308, 312, 116 S. Ct. 1307, 1310 (1996).   Similarly

uncontroversial is the third element, with defendant readily conceding that

plaintiff's employment was involuntarily terminated on September 17, 2004.  It is with respect to the second and fourth elements of the governing standard that the parties part company.

Defendant contests plaintiff's ability to satisfy the second prong of the *prima facie* discrimination test, addressing the employee's qualifications for the position in issue.  Its quarrel in that regard is predicated upon a narrow view of the qualification requirement, with Lander asserting that to succeed at this point a plaintiff who, like Ferguson, has been discharged must demonstrate that he or she was meeting the employer's expectations, and was performing to the defendant's satisfaction, at the time of termination.

It is true, as the Second Circuit has noted, that "in cases of alleged discriminatory discharge [that court has] occasionally analyzed [the element of qualification] in terms of whether plaintiff shows 'satisfactory job performance' at the time of discharge."  *Thornley v. Penton Publ'g, Inc.,* 104 F.3d 26, 29 (2d Cir. 1997) (citations omitted); *see also Slattery,* 248 F.3d at 91.  In *Slattery,* however, the Second Circuit reassured that it had not raised the bar beyond that set by the Supreme Court for determining the sufficiency of a *prima facie* showing of qualification, observing that a

44

court may use the terms "performing his [or her] duties satisfactorily" and "qualified for the job" interchangeably so long as "all that is required that is the plaintiff establish basic eligibility for the position, and not the greater showing that he [or she] satisfies the employer."  *Slattery*, 248 F.3d at 91-92 (citing, *inter alia, Burdine,* 450 U.S. at 254, 101 S. Ct. at 1094); *see also Taylor v. Local 32E Serv. Employees Int'l Union,* 286 F. Supp. 2d 246, 252 n.3 (S.D.N.Y. 2003).

In this instance plaintiff easily meets this relaxed standard.  No one could dispute that the plaintiff possessed the educational and experiential qualifications required for the position of Controller at a facility like the Lander Binghamton plant.  Indeed, Ferguson performed in that job from 1998 until the time of his termination, receiving extremely positive evaluations from Lander management personnel in 1999, and again in 2000.  I therefore find, based upon the evidence adduced at trial, that this required showing has been met.

Although the defendant also vigorously disputes whether the fourth element has also been met, the evidence at trial established that plaintiff's termination occurred under circumstances which, at a minimum, give rise to an inference of discrimination.  As is more comprehensibly examined

45

later in this opinion, consideration of the ages of the decision-makers at the company, and of the employees who absorbed plaintiff's duties following his discharge, coupled with comparison by age of those employees affected by the RIF with those who were retained, adequately supports the requisite inference of age discrimination, for purposes of plaintiff's *prima facia* case.[32]

> b)    Defendant's Articulated Reasons for the Termination

In defense of its decision to terminate plaintiff's employment, Lander asserts that action was taken based upon two primary considerations, including 1) the need to reduce costs in order to increase profitability and stem the flow of losses, and to satisfy the company's primary lender, and 2) the belief that plaintiff was not performing to the company's expectations in the position.  Since at this juncture "[a]ny stated reason is sufficient; the employer need not persuade the court that the proffered reason was the actual reason for its decision[,]" *Tarshis,* 211 F.3d at 36, this suffices to return the burden of production to the plaintiff.

> c)    Pretext/Discrimination

At this point in the analysis, the presumption of discrimination which

---

[32]    *See* pp. 50-51, *post.*

46

attaches upon a successful *prima facie* showing dissipates, and plaintiff retains the burden of establishing intentional discrimination by preponderance of the evidence.  *Reeves,* 530 U.S. at 143, 120 S. Ct. at 2106; *Burdine,* 450 U.S. at 256, 101 S. Ct. at 1095.  As the Supreme Court observed in *Reeves,* however, this does not mean that at this stage the factors offered in support of the plaintiff's *prima facie* showing become unimportant; rather, in assessing discrimination "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether defendant's explanation is pretextual,'" and whether the plaintiff has been the victim of potential discrimination.  *Reeves,* 530 U.S. at 143, 120 S. Ct. at 2106 (quoting *Burdine*, 450 U.S. at 255 n.10, 101 S. Ct. at 1095 n.10).

Based upon the evidence adduced at trial, it appears clear that while the decision to terminate plaintiff's employment was heavily dependent upon a recommendation made by John Nabial, the company's Controller, the ultimate decision of who to include on the September 17, 2004 RIF list rested with Joseph Falsetti, the company's chairman and CEO, as well as a part owner in the Hermes acquisition group, with significant input from Mark Massad, the company's senior Vice President for Finance and CFO.

47

Unfortunately, neither of those individuals – both of whom remain affiliated with the company – was produced at trial to testify, and they were thus unable to articulate for the court the thought process leading up to the decision to terminate plaintiff's employment, including the factors considered.[33]  Nor was the court presented with any illumination as to why Binghamton Plant Controller Ferguson was selected over Cost Accountant Hess for layoff, while in Toronto Au-Yeung was retained and the older Cost Accountant, Ranga Sheshardi, was discharged.  Given defendant's failure to call either of these crucial witnesses, including particularly the ultimate decision-maker in connection with the September, 2004 RIF process, I have drawn an inference adverse to the defendant concerning what their testimony would have revealed, and in particular as it relates to the basis for making these distinctions.  *Scully v. Summers,* No. 95 CIV. 9091, 2000 WL 1234588, at *17 (S.D.N.Y. Aug. 30, 2000) (failure to call the employee who ultimately made the selection of who to appoint, based upon a ranking panel's recommendations, warranted imposition of an adverse inference in a non-jury trial involving claims of age discrimination under the ADEA); *see also DiPirro v. United States,* 189 F.R.D. 60, 65

---

[33]     According to the defendant's pretrial submission, at the time of trial Falsetti was employed as the Executive Chairman of Ascendia.

48

(W.D.N.Y. 1999) ("When 'a party has it peculiarly within [its] power to produce witnesses whose testimony would elucidate the transaction' and fails to produce such witnesses, the [factfinder] may infer that 'the testimony if produced, would be unfavorable' to that party.") (quoting *United States v. Torres,* 845 F.2d 1165, 1169-70 (2d Cir. 1988)).

In this instance there are many other indicators, in addition to this negative inference, that age indeed was a motivating factor in the decision to include Ferguson in the RIF.  Virtually all of the persons participating in the process leading to plaintiff's termination were substantially younger than the plaintiff, and following the RIF all of the plaintiff's duties were absorbed by Lander employees considerably younger than him.  *See Reeves,* 530 U.S. at 142, 146, 120 S. Ct. 2106, 2107-08.  Within the finance department, only two employees were included among those laid off as part of the RIF; both of those employees were fifty-five years of age or older.  And, tellingly, while both Lander manufacturing plants had Plant Controllers and Cost Accountants, in each instance the older of the two lost employment during the RIF, while the younger remained in the company's employ.

In finding age discrimination, I have also given consideration to the

fact that ten of the sixteen employees who lost their employment at Lander on September 17, 2004 were age forty-eight or older. While this fact alone has limited significance absent more comprehensive data regarding the demographics of the entire workforce, in this instance it nonetheless lends further support to the inference that age was considered as a motivating factor in deciding who to include within the reduction, given that available information reveals a significant number of younger employees whose jobs survived the RIF.

One of the more telling factors in the age discrimination analysis is the explanation given by John Nabial for his impression that plaintiff's position should be eliminated. Nabial testified that in light of the creation of his position as Company Controller, coupled with the presence of a strong Cost Accountant at Binghamton, there was no need to continue the Plant Controller position at Binghamton. Yet, while it is true that plaintiff's position at Binghamton was never reinstated after his discharge, the explanation given by the defendant for retaining the Plant Controller office in the much smaller Toronto facility, despite the creation of Nabial's Controller position and the presence of a Cost Accountant in that facility as well, was unpersuasive.

In finding age discrimination I have also given strong consideration to the Herculean efforts by the defendant to justify the plaintiff's dismissal. Despite plaintiff's apparently competent job performance at the Binghamton facility, and his significant role in the three major projects undertaken at Lander following the Hermes acquisition, and the lack of any written communication from John Nabial to the plaintiff suggesting that his performance was significantly deficient, and before even receiving the 360 feedback sought plaintiff's co-workers, by his own account Nabial already formed an impression that plaintiff must go. Efforts were made to legitimize that decision by utilizing a process used by the company only once previously – in 2003 in connection with a short term employee – to seek input from plaintiff's co-workers. Based upon the evidence adduced it is clear that the end result – the evaluation given by Nabial to the plaintiff – not only was the product of a process tailored to garner support for his decision to recommend plaintiff's discharge, but additionally was significantly skewed and did not accurately and fully reflect the input received from those co-workers. Indeed, I am convinced based upon the testimony at trial that the 360 evaluation form attributed by Nabial to having been the product of a conversation with Steven Hess was

51

fabricated and did not at all accurately depict Hess's impressions of the plaintiff, as conveyed to Nabial, but instead was no more than a copy of what was recorded based upon answers of Lisa Wascalis, who clearly did not like the plaintiff, nor did she believe he was performing adequately as her supervisor.  The significantly inflated criticisms of plaintiff's performance as set forth in Nabial's evaluations, lends support to the inference that his efforts to legitimize his concerns over plaintiff's performance were intended to mask his age bias.

When examining age discrimination, a factfinder can consider whether the explanation offered for taking the adverse job action at issue is false, unbelievable, and/or unworthy of credence, *Reeves,* 530 U.S. at 143, 146-47, 530 S. Ct. at 2106-08, as well as whether the employer's explanation for the decision has changed over time.  *See Windham,* 275 F.3d at 190.  Since the termination of plaintiff's employment, Lander has given varying accounts of the reasons for plaintiff's termination.  In an undated letter sent by defendant's attorney, Paul C. Taylor, Esq., in response to a letter from plaintiff's counsel regarding the termination, it was intimated that plaintiff's performance was deficient.  In the letter, counsel for Lander advised that

52

> [s]imply stated, Mr. Ferguson's performance was unacceptable for an employee at his level and Lander began considering the appropriate course of action to deal with this substandard performance.  Management discussed Mr. Ferguson's numerous problems and when a position elimination became necessary, Mr. Ferguson was the obvious choice.[34]

Similar assertions were made in a letter dated November 19, 2004 from defendant's counsel to the New York State Division of Human Rights. This later communication pinpointed the decision to terminate plaintiff's employment as having been "made and communicated to members of upper management and outside consultants in July of 2004."  Significantly, the letter also stated that plaintiff was evaluated in June of 2004 "[p]ursuant to normal company procedure", going on to state that the confidential 360 degree feedback process utilized by Nabial "was used for many employees at new Lander" when, in point of fact, the only other Lander employee to have been evaluated pursuant to that process, which was not prescribed in the new human resources manual prepared following the Hermes acquisition of the company, was Beth Chapin, a

---

[34]    That letter went on to state that the decision was made well before company officials became aware of plaintiff's application for FMLA leave on August 10, 2004.

person who at the time of the evaluation in 2003 had been employed by the company at its Binghamton facility for only a short period of time.

These statements not only vary among themselves, and lack evidentiary support, but they are also at odds with Di Bari's statement to the plaintiff at the time of his discharge, stating in effect that his performance did not influence the decision.  As was noted earlier, the fact that the defendant employer's explanations for the disputed employment decision have shifted over time is a matter which a factfinder may find persuasive as evidence of pretext and/or discrimination.  *See Windham,* 275 F.3d at 190.

This combination of factors convincingly satisfies me that plaintiff's age played a role in, and was a motivating factor with respect to, defendant's decision to terminate his employment as the Binghamton Plant Comptroller in September of 2004, thus establishing a violation of his protected rights under the ADEA and the New York HRL.

> 2.   FMLA Violation

The FMLA guarantees qualifying employees twelve weeks of unpaid leave in order, *inter alia*, to assist in the care of a family member who suffers from a serious health condition.  29 U.S.C. § 2612(a)(1)(C); *see*

54

*Cinelli v. Oppenheim-Ephratah Cent. Sch. Dist.*, No. 07-CV-235, 2008 WL

111174, at *2 (N.D.N.Y. Jan. 7, 2008) (DiBianco, M.J.). The Act also

prohibits an employer from interfering with the exercise of an employee's

protected rights under that statute.  29 U.S.C. § 2615(a).

Plaintiff's FMLA claim has two distinct components.  First, Ferguson

asserts that his rights under the Act were violated when Lander failed to

respond to his leave request within two business days after his having

provided company officials with the requested medical certification

regarding his son.[35]  Secondly, plaintiff attributes the termination of his

employment to his filing of the FMLA request and the fact that he inquired,

only a day before the September 17, 2004 reduction in force, concerning

the status of his request.

a)    Delay in Responding to Plaintiff's Leave Request

The FMLA requires an employer to respond to a leave request falling

within the Act's purview within two business days, advising whether the

leave has been granted, and if so whether it is to be regarded as paid

---

[35]    The third cause of action in plaintiff's complaint, addressing the FMLA, is
entitled "retaliation in violation of 29 U.S.C. § 2615(a), *et seq.* (the FMLA)." Complaint
(Dkt. No. 1) at 7.  The body of that claim, however, addresses not only retaliation but
additionally the company's failure to answer plaintiff's request for FMLA leave within
two business days. *See id.* ¶ 48.  In light of this, and the fact that the defendant has
not objected to assertion of the claim, I will address the two-day response time violation
now asserted by the plaintiff.

leave or otherwise.  29 C.F.R § 825.208(a), (c); *see Saroli v. Automation & Modular Components, Inc.,* 405 F.3d 446, 454 (6th Cir. 2005).  In this instance, regardless of whether internal company communications were exchanged in which Binghamton HR Manager Joan Lieb was instructed to notify Ferguson that his request for leave was being granted, it is undisputed that plaintiff in fact did not receive written notification from the company regarding the disposition of his leave application prior to his discharge on September 17, 2004 until well after expiration of this two-day period.  Accordingly, plaintiff has established that the notification requirement of the FMLA was not met by Lander in connection with his leave request.

While a technical violation of the FMLA has been established, plaintiff has provided the court with no authority to suggest that the violation in and of itself gives rise to a private right of action, and what limited authority the court has uncovered suggests otherwise.  *See, e.g., Saroli,* 405 F.3d at 453.  It is only in the event of a showing that the failure constituted a violation of section 2615, prohibiting an employer from interfering with the exercise of any right under the Act, that a right of recovery will be found to exist.  *Saroli,* 405 F.3d at 453.

56

In this instance plaintiff was discharged before his request for FMLA leave came into play.  Based upon this circumstance, in not approving plaintiff's leave request in a timely fashion Lander did not interfere with his rights under the Act, and Ferguson suffered no monetary loss or prejudice as a result of that violation.  Accordingly, plaintiff is not entitled to recover damages from the defendant for that technical FMLA violation.

### b)   FMLA Retaliation

Applying section 2615(a), courts have recognized that the Act prohibits an employer from retaliating against or otherwise taking adverse employment action with respect to an employee who has exercised his or her rights under the FMLA.  *See Potenza v. City of New York,* 365 F.3d 165, 167-68 (2d Cir. 2004); *Saroli,* 405 F.3d at 450-51; *see also Lundy v. Town of Brighton*, 521 F. Supp. 2d 259, 264 (W.D.N.Y. 2007).  To establish a claim of retaliation under section 2615(a)(1), a plaintiff must establish that 1) he or she engaged in conduct protected under the Act; 2) the defendant was aware of the protected conduct; 3) defendant took adverse employment action with respect to the plaintiff; and 4) a causal connection exists between the protected conduct and the adverse employment action.  *Saroli*, 405 F.3d at 451 (citing *Skrjanc v. Great Lakes*

57

*Power Serv. Co.,* 272 F.3d 309, 314 (6th Cir. 2001)); *cf. Dillon v. Moreno,* 497 F.3d 247, 251 (2d Cir. 2007) (employing a similar test to address a claim under 42 U.S.C. § 1983 for unlawful retaliation and violation of the First Amendment).

Claims of retaliation under the FMLA are analyzed under the burden shifting algorythm generally applicable to discrimination claims. *Potenza,* 365 F.3d at 168. In order to state a *prima facie* case of FMLA retaliation, a plaintiff must demonstrate that he or she 1) exercised rights under the FMLA; 2) was qualified for the position held; 3) suffered an adverse employment action; and additionally that 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliation. *Id.* at 168. Upon establishment of a *prima facie* showing of retaliation, it then becomes incumbent upon the defendant to set forth a legitimate, non-discriminatory reason for having taken adverse action. *Dupee v. Klaff's, Inc.*, 462 F. Supp. 2d 233, 242 (D. Conn. 2006). Once the defendant has offered a neutral explanation for the adverse action under examination, the burden then returns to the plaintiff to demonstrate pretext and that retaliation was a motivating factor in the decision. *Id.* As is the case with regard claims under to claims under ADEA, the ultimate

burden of proof proving retaliation by a preponderance of the evidence rests with the plaintiff at all times.  *Russell v. Verizon Communications, Inc.*, No. 01-CV-752A, 2007 WL 602239, at *4 (W.D.N.Y. Feb. 20, 2007).

Having carefully reviewed the evidence adduced at trial, I find that plaintiff has not established a *prima facie* case of retaliation under the FMLA.  While the first three elements of the *prima facie* showing have been met, the record convincingly establishes that the termination of plaintiff's employment did not occur under circumstances giving rise to an inference of unlawful retaliation.  It is true that plaintiff's employment was terminated only one day after his inquiry regarding the status of his request for FMLA leave.  It appears abundantly clear, however, that a decision was made much sooner, perhaps by June of 2004 or even earlier, to target Ferguson for termination – well before the filing of his FMLA leave request – and that the timing of the implementation was strictly the result of a desire to coordinate the termination of employment with the reductions in force planned for and ultimately effectuated on September 17, 2004.  Accordingly, I find that plaintiff has not established a claim of unlawful retaliation in violation of the FMLA.

59

C.    Relief

The remedies available to a plaintiff in the event of a showing of age discrimination in violation of the ADEA, whose civil enforcement provisions are dependent upon those applicable generally to the Fair Labor Standards Act, *Feltner v. Columbia Pictures Television*, 523 U.S. 340, 347, 118 S. Ct. 1284 (1998), are limited.  *Daigneault v. Eaton Corp.,* No. 3:04-cv-984, 2008 WL 410582, at *3 (D. Conn. Feb. 12, 2008).  In addition to reinstatement, which Ferguson does not now seek, the Act permits awards of back pay and, in the event of the showing of a willful violation, liquidated damages.  *Id.*; *see also Johnson v. Al Tech Specialties Steel Corp.,* 731 F.2d 143, 147-48 (2d Cir. 1984).  The ADEA also permits recovery of costs, including reasonable attorneys' fees, by a prevailing party.  *See Brooks v. Travelers Ins. Co.*, 297 F.3d 167, 171 (2d Cir. 2002).

Unlike other of its federal counterparts such as Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, *see* 42 U.S.C. § 1981a, the ADEA does not permit recovery of compensatory damages, including for mental anguish and emotional distress.  *See Cross v. New York City Transit Auth.,* 417 F.3d 241, 258 (2d Cir. 2005) (citing *Haskell v. Kaman Corp.,* 743 F.2d 113, 120-21 (2d Cir. 1984)); *Townsend*

*v. Exchange Ins. Co.,* 196 F. Supp.2d 300, 306 (W.D.N.Y. 2002).  Such

damages are, however, potentially recoverable under the New York HRL.

*Cross,* 417 F.3d at 258; *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176,

1190-91 (2d Cir. 1992); *McKenna v. Senior Life Mgmt., Inc.*, 429 F. Supp.

2d 695, 699 n.5 (S.D.N.Y. 2006).

### 1.   Back Pay

"A plaintiff who has proven a discharge in violation of the ADEA is,

as a general matter, entitled to backpay from the date of discharge until

the date of judgment."  *Kirsch v. Fleet St., Ltd.,* 148 F.3d 149, 167 (2d Cir.

1998); *accord Banks v. Travelers Companies,* 180 F.3d 358, 364 (2d Cir.

1999).  The determination of how much to award a prevailing plaintiff in

back pay is committed to the sound discretion of the factfinder, based

upon the evidence presented at trial.  *Townsend v. Exchange Ins. Co.*,

196 F. Supp. 2d 300, 307 (W.D.N.Y. 2002) ("The choice of whether to

award back pay is left to the equitable discretion of the district court.")

(citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415-16, 95 S. Ct.

2362, 2370-71 (1975)).

An award of back pay serves to further the salutary objective of

making a victim of employment discrimination whole.  *See Albemarle*

*Paper Co.*, 422 U.S. at 421, 95 S. Ct. at 2373.  Accordingly, any damages which a plaintiff is entitled to recover must be reduced not only by the amounts actually earned from other employment from the date of discharge until the time of judgment, but also to account for such additional sums the plaintiff could have earned by reasonable effort during the period by seeking new employment.  *See Townsend*, 196 F. Supp. 2d at 307 (citing, *inter alia*, *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 144-45 (2d Cir. 1993)); *Bonura v. Chase Manhattan Bank, N.A.*, 629 F. Supp. 353, 355 (S.D.N.Y. 1986).  Both the ADEA and the New York HRL require a victim of employment discrimination to mitigate his or her damages, using "reasonable diligence in finding other suitable employment."  *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231, 102 S. Ct. 3057, 3065 (1982); *see also Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 695 (2d Cir. 1998); *Vernon v. Port Auth. of New York and New Jersey*, 220 F. Supp. 2d 223, 234-35 (S.D.N.Y. 2002) (citing *Hawkins*); *Epter v. New York City Transit Auth.*, 216 F. Supp. 2d 131, 135-36 (E.D.N.Y. 2002).   In determining whether a plaintiff has fulfilled this duty of mitigation, the factfinder must consider whether a reasonable person would not have sought reemployment or accepted a particular job.  The

law requires only that a plaintiff accept employment that is of a like nature.
*See Clarke v. Frank*, 960 F.2d 1146, 1152 (2d Cir. 1992) ("The claimant
need not accept employment that is not comparable to his previous
position.").  Failure to properly mitigate damages is an affirmative defense,
upon which the defendant-employer bears the burden.  *See*, *e.g.*,
*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d
Cir. 1994).

To calculate plaintiff's economic loss in this case I have used, as a
starting point, his salary of $88,504 per year at the time of his firing on
September 17, 2004.[36]  For purposes of this calculation I have assumed
that plaintiff would have received a two and one-tenth percent yearly
increase in salary while at Lander, in reliance upon the expert testimony of
Rosemary Avery.  I then compared the resulting figures with plaintiff's
actual earnings from the State of Pennsylvania, adjusted to reflect the
additional required expenditures for rent and utilities – though not for food
– which the plaintiff would have had to purchase, regardless of where he
was living.  Employing this methodology, I have calculated the following

---

[36]     While plaintiff was also receiving return on gross assets ("ROGA")
incentive payments in early 2004, over and above that salary figure, those payments
were discontinued after September of 2004, and were not later reinstated by the
company.  Those ROGA payments have therefore not been considered in calculating
economic losses suffered by the plaintiff.

net economic losses, exclusive of interest:[37, 38]

| Year | Lander Projected Salary | Minus Actual Earnings from PA | Plus Rent & Utility | Net Loss |
|------|------------------------|------------------------------|---------------------|----------|
| 2004 | $23,328.00 | -0- | -0- | $23,328.00 |
| 2005 | $90,363.00 | $38,692.00 | $3,630.00 | $55,301.00 |
| 2006 | $92,260.00 | $79,103.00 | $7,388.00 | $20,545.00 |

From my analysis, confirmed by the testimony of plaintiff's economic expert, it is clear that by the end of 2006 plaintiff had fully mitigated his losses, and thus is not entitled to any further damages for economic loss as a result of the termination beyond that point.

In addition to back pay, plaintiff is also entitled to recover prejudgment

---

[37]   As can be seen, I have exercised my discretion against deducting, as payments from a collateral source, the unemployment benefits received by plaintiff from the New York State Department of Labor.  *See Dailey v. Societe Generale,* 108 F.3d 451, 460-61 (2d Cir. 1997) (holding that "the decision whether or not to deduct unemployment benefits from a Title VII back pay award rests in the sound discretion of the district court"); *see also Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104, 1112-13 (8th Cir. 1994) (holding that unemployment insurance may not be used to offset losses when calculating back pay awarded under the ADEA).  The decision not to reduce the award for economic loss by the amount of unemployment benefits received by the plaintiff will not necessarily result in a windfall to him, at least not in theory, since he may well be obligated to return the unemployment benefits received by him in place of lost income for which he now being compensated.  *See*, *e.g.*, *Claim of Stewart*, 279 A.D. 500, 501, 111 N.Y.S.2d 192, 192 (3d Dep't 1952) (following arbitration of labor dispute stemming from layoff of employees, employees were awarded back pay, making them ineligible for unemployment benefits which had been paid during layoff period).

[38]   It should be noted that this calculation does not take into consideration any differences in benefits and pension plans between the two places of employment, plaintiff's economic expert having testified that they were reasonably comparable.

interest on his economic losses.  *Sharkey v. Lasmo (AUL Ltd.)*, 214 F.3d 371, 375 (2d Cir. 2000); *see also Picinich v. United Parcel Service,* No. 5:01-CV-01868, 2005 WL 3542571, at *30 (N.D.N.Y. Dec. 23, 2005), *vacated on other grounds*, 236 Fed. Appx. 663, 2007 WL 1704948, at *1-2 (2d Cir. June 11, 2000) ("[I]n cases where the damage award is for lost wages, it is generally an abuse of discretion not to award prejudgment interest.") (citations omitted).  Awarding pretrial judgment interest serves the dual purposes of making the victim whole, while at the same time preventing the employer from enjoying the interest-free use of money which has been wrongfully withheld from the plaintiff.  *Luciano v. Olsten Corp.*, 912 F. Supp. 663, 676 (E.D.N.Y. 1996).

The methodology to be used in calculating prejudgment interest, including the appropriate rate of interest to be applied, is also a matter which rests with the discretion of the court.  *Luciano,* 912 F. Supp. at 676-77; *see also Scalamandre v. Oxford Health Plans (N.Y.), Inc.,* 823 F. Supp. 1050, 1064 (E.D.N.Y. 1993) (citing *Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d 293, 311 (2d Cir. 1987)).  There is a considerable divergence of opinion as to the most appropriate means for determining a suitable prejudgment interest rate.  *See Torres v. Costich,* 935 F. Supp.

232, 236 (W.D.N.Y. 1996); *Frank v. Relin,* 851 F. Supp. 87, 91 (W.D.N.Y. 1994); *see also Taylor v. Cent. Pennsylvania Drug & Alcohol Servs. Corp.,* 890 F. Supp. 360, 368 (M.D. Pa. 1995).  Many courts have looked for guidance to the applicable post-judgment interest statute, 28 U.S.C. § 1961.  *See, e.g., Torres,* 935 F. Supp. at 236; *O'Quinn v. New York Univ. Med. Ctr.,* 933 F. Supp. 341, 345 (S.D.N.Y. 1996); *Frank,* 851 F. Supp. at 91 (W.D.N.Y. 1994); *see also Chandler v. Bombardier Capital, Inc.,* 44 F.3d 80, 84 (2d Cir. 1994); *Softell, Inc. v. Dragon Med. and Scientific Communications Ltd.,* 891 F. Supp. 935, 944-45 (S.D.N.Y. 1995).  Others have resorted to the income tax under and overpayment provision set forth in 26 U.S.C. § 6621, which normally yields a significantly higher rate. *Rush v. Scott Specialty Gases, Inc.,* 940 F. Supp. 814, 818 (E.D. Pa. 1996); *Taylor,* 835 F. Supp. at 369; *Brooks v. Fonda-Fultonville Cent. Sch. Dist.,* 938 F. Supp. 1094, 1110 (N.D.N.Y. 1996) (Hurd, M.J.).  Still others have employed various different approaches.  *See, e.g., Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 371-72 (2d Cir. 1995) (9% rate applied); *Kinek v. Paramount Communications, Inc.,* 22 F.3d 503, 514 (2d Cir. 1994) (utilizing effective discount rate of 9.5%); *In Re Crazy Eddie Securities Litigation,* 948 F. Supp. 1154, 1167

66

(E.D.N.Y. 1996) (New York CPLR § 5004 rate of 9% applied to judgment on federal claim); *United States v. Giovanelli*, 853 F. Supp. 88, 93 (S.D.N.Y. 1994) (prime interest rate utilized), *amended and superseded on other grounds*, 1994 WL 416158 (S.D.N.Y. Aug. 5, 1994); *Employer-Teamster Joint Council No. 84, Health and Welfare Fund v. Weatherall Concrete, Inc.,* 468 F. Supp. 1167, 1171 (S.D. W.Va. 1979) (applying rate charged by banks for use of money to compensate plaintiffs for delay in receipt).

The Second Circuit has not definitively spoken concerning the particular methodology to be employed. *Torres,* 935 F. Supp. at 236; *Frank,* 851 F. Supp. at 91; *see also Robinson v. Instructional Systems, Inc.*, 80 F. Supp. 2d 203, 208 (S.D.N.Y. 2000) ("The decision of which rate of interest to apply for the prejudgment interest is a '[m]atter[ ] confided to the district court's broad discretion.'") (quoting *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071 (2d Cir. 1995)). It has at various times, however, found that using either 28 U.S.C. § 1961 or 26 U.S.C. § 6621 does not present an abuse of discretion. *See, e.g., S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1476-77 (2d Cir. 1996), *cert. denied,* 522 U.S. 812, 118 S. Ct. 57 (1997) (26 U.S.C. § 6621);

*Scalamandre,* 823 F. Supp. at 1064 (26 U.S.C. § 6621); *Chandler,* 44 F.3d at 84 (28 U.S.C. § 1961).  Courts within this circuit additionally have observed that where, as here, a judgment is based on violations of both federal and state law, courts routinely have applied a federal interest rate, most commonly that based on 28 U.S.C. § 1961.  *Zakre v. Norddeutsche Landesbank Girozentrale*, __ F. Supp. 2d __, 2008 WL 351662, at *12 (S.D.N.Y. Feb. 8, 2008) (citing cases).

As can be seen, when awarding interest in a case such as this various courts, including those within the Second Circuit, have looked to 28 U.S.C. § 1961(a) for guidance.  *See Picinich,* 2005 WL 3542571, at *30.  In this instance I will follow suit, and will award prejudgment interest calculated based upon the United States Treasury Bill rate set forth in 28 U.S.C. § 1961(a), compounded annually.[39]  With the addition of prejudgment interest, the following amounts are awarded for lost wages, calculated to April 1, 2008:

| Year | Net Loss | T-Bill Rate | Principal Plus Interest |
|------|----------|-------------|-------------------------|
| 2004 | $23,328  | 1.26%       | $24,450.00              |

---

[39]     To simplify the required computation, when compounding I have assumed that plaintiff's annual salary was fully earned at the mid-point of each given year.

| 2005 | $55,301 | 3.02% | $60,021.00 |
| 2006 | $20,545 | 4.90% | $22,344.00 |
| | TOTAL: | | $106,815.00 |

### 3.   Compensatory Damages

Having prevailed on his age discrimination claim under the HRL, plaintiff is also entitled to recover compensatory damages for mental anguish and emotional distress.  *See Gagliardi v. Universal Outdoor Holdings, Inc.*, 137 F. Supp. 2d 374, 381 (S.D.N.Y. 2001) (citing N.Y. Exec. Law § 297).

When addressing the element of relief in cases such as this, where no medical testimony has been offered reflecting that the plaintiff has sought professional counseling or incurred a diagnosis of a recognized mental disorder or condition, courts have often assigned the label "garden variety" to such mental anguish claims.  In New York, compensatory damage awards in such garden variety cases, while varied, historically have been less than $100,000.  *See, e.g., Board of Educ. of Ravena-Coeymans-Selkirk Cent. Sch. Dist. v. State Div. of Human Rights*, 109 A.D.2d 988, 990-91, 486 N.Y.S.2d 469, 472 (3d Dep't 1985) (awarding $5,000 in damages for mental anguish); *Marcus Garvey Nursing Home, Inc. v. New*

69

*York State Div. of Human Rights,* 209 A.D.2d 619, 620, 619 N.Y.S.2d 106,

108 (2d Dep't 1994) (mental anguish award of $150,000 ordered reduced

to an amount not exceeding $75,000); *State v. New York State Div. of*

*Human Rights,* 284 A.D.2d 882, 884, 727 N.Y.S.2d 499, 502 (3d Dep't

2001) ($50,000 award for mental anguish found excessive and reduced to

$20,000).

The evidence at trial reflected that plaintiff did not seek counseling or

treatment as a result of defendant's decision to terminate his employment,

nor has he been diagnosed as suffering from any recognized mental

disorder attributable to that decision.  And, while both plaintiff and his wife

testified to his having experienced embarrassment and humiliation, neither

was able to point to any significant, tangible physical consequences

resulting from the termination.[40]  Based upon the facts adduced at trial and

---

[40]    I recognize that to recover compensatory damages under the HRL, a
plaintiff is not required to demonstrate any physical manifestations associated with his
or her mental anguish and emotional distress.  *See Club Swamp Annex v. White*, 167
A.D.2d 400, 402-03, 561 N.Y.S.2d 609, 611 (2d Dep't 1990) (noting that it is well-
settled that "a complainant's testimony as to the mental anguish he suffered is
sufficient" to support an award of compensatory damages for mental anguish and
emotional distress).  The existence of such physical consequences as sleeplessness,
weight loss, intestinal irritations, headaches, and the like, however, are nonetheless
relevant when determining whether, and if so in what amount, such damages should
be awarded.  *See*, *e.g.*, *New York State Dep't of Corr. Servs. v. New York State Div. of*
*Human Rights*, 265 A.D.2d 809, 809, 695 N.Y.S.2d 647, 648 (4th Dep't 1999)
(affirming award of $10,000 in compensatory damages where plaintiff's only physical
symptom consisted of a feeling of weakness, and she never sought medical or
psychiatric treatment).

principally plaintiff's testimony concerning the impact upon him of

defendant's decision to terminate his employment, I find that an award of

$25,000 is fair and reasonable to compensate him for damages for mental

anguish and emotional distress.  *See Cross,* 417 F.3d at 258-59 (declining

to disturb compensatory damage award of $50,000 in case involving no

treatment or diagnosis).

### 4.   Liquidated Damages

In addition to requesting back pay and compensatory damages,

plaintiff seeks a further award of liquidated damages.  Under certain

circumstances the ADEA permits recovery by a prevailing plaintiff of an

award of liquidated damages, equaling the amount of unpaid wages

proven at trial.  29 U.S.C. §§ 216(b) and 626(b); *see Cross*, 417 F.3d at

252.  In order to recover liquidated damages, a plaintiff must prove that the

violation committed was willful, in that defendant actually knew that its

conduct violated federal law, or that it acted in reckless disregard of that

fact.  *Cross*, 417 F.3d at 252-53*; see also Hazen Paper Co.,* 507 U.S. at

614, 113, S. Ct. at 1708; *Trans World Airlines, Inc. v. Thurston,* 469 U.S.

111, 126, 105 S. Ct. 613, 624 (1985).  In this instance I find that while

plaintiff's rights under the ADEA were abridged, the violation was neither

accomplished by the defendant knowing that its conduct violated federal law, nor was it in reckless disregard of plaintiff's rights under the ADEA. Accordingly, I decline plaintiff's invitation to award liquidated damages as part of the judgment to be entered.

### 5.   Costs and Attorneys' Fees

The ADEA also permits a prevailing plaintiff to recover cost of the action, including a reasonable attorneys' fee.[41]  29 U.S.C. § 626(b) ("The provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provides in [the Fair Labor Standards Act, 29 U.S.C. §§ 211(b), 216)]; 29 U.S.C. § 216(b) ("The court in [an ADEA action] shall, in addition to any judgment awarded to the plaintiff . . . allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."); *see Brooks*, 297 F.3d at 171.  In this instance, finding no basis to conclude that the interests of justice counsel against such an award, I will grant plaintiff's request and award costs of the action, including reasonable attorneys' fees.  Plaintiff is directed to make application to the court, with appropriate proof to support the request, within fourteen days

---

[41]    The New York HRL does not have a similar fee-shifting statute.  *See In re Arbitration of Briamonte v. Liberty Brokerage, Inc.*, No. 99 CIV 2735, 2000 WL 666350, at *2 (S.D.N.Y. 2000) (refusing to award attorneys' fees under the New York Human Rights law absent the required statutory authority).

after the entry of judgment as required.  *See* Fed. R. Civ. P. Rule 54(d).

V.    SUMMARY AND CONCLUSION

The evidence in this case reveals that in terminating plaintiff's employment, Lander acted on the assumption that because of his age plaintiff would be unable to conform his job performance as Plant Controller to the expectations of the new Lander management, without first engaging in any discernable, meaningful measures to test the theory and determine whether, with guidance, he could meet the company's expectations as he apparently had in prior years.  The fact that such thinking factored heavily into the decision to terminate plaintiff's employment demonstrates that age played a significant role in the determination.  Simply stated, "[an] employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly."  *Hazen Paper Co.,* 507 U.S. at 611, 113 S. Ct. at 1706.

Without question, the decision to terminate the plaintiff's employment as Binghamton Plaint Controller was by no means purely the product of rank, unadulterated age bias.  Rather, the evidence at trial reflects that the decision was markedly influenced by two other considerations, including

73

John Nabial's questions regarding plaintiff's capabilities, and the need to reduce the company's workforce in order to stem the tide of ongoing financial losses and satisfy the company's major lender, CIT. Nonetheless, the proof at trial also convincingly establishes that when opting to terminate plaintiff's employment, as well as that of others within the company, while plaintiff's FMLA leave application played no role in the decision, the decisionmakers employed age as a factor, and that it had considerable influence on the decision, particularly when faced with determining who, within the finance department, and as between the Controller and Cost Accountant at both of the company's manufacturing facilities, should be included in the workforce reduction.

The law requires that an employer ignore age as a consideration when making employment decisions. *See* 29 U.S.C. § 623(a)(1); *Reeves*, 530 U.S. at 141, 120 S. Ct. at 2105. The failure of management officials at Lander to disregard age as a criteria when deciding to terminate plaintiff's employment warrants a finding that plaintiff has established a claim of age discrimination, in violation of both the ADEA and the HRL. And, based upon my finding that plaintiff has proven that he suffered damages as a proximate result of defendant's discriminatory conduct, I am

74

awarding damages in his favor and against the defendant in the amount of $106,815 to compensate him for the economic loss suffered, plus the additional sum of $25,000 in damages for mental anguish and emotional distress, for a total award of $131,815. Based upon the foregoing, it is hereby

ORDERED that the clerk enter judgment in plaintiff's favor and against the defendant finding unlawful discrimination on the basis of age, in violation of the ADEA and New York HRL, and awarding plaintiff damages in the amount of $131,815 without prejudice to plaintiff's right to apply for an award of costs and attorneys' fees pursuant to 29 U.S.C. §§ 216(b), 626(b) and Rule 54(d) of the Federal Rules of Civil Procedure within fourteen days of the date of the entry of judgment.


Dated:   April 2, 2008
         Syracuse, NY



David E. Peebles
U.S. Magistrate Judge



75